UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| BRENETT ROBERTSON, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15 CV 2 DDN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Brenett Robertson for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. § 401, *et seq*. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Commissioner is affirmed.

## I. BACKGROUND

Plaintiff was born on January 15, 1968. (Tr. 241.) She filed her application for Disability Insurance Benefits on October 17, 2011. (Tr. 156.) She alleged an onset date of October 6, 2011. (Tr. 204.) She alleged that she was unable to work due to spasms in the arteries, heart attacks, asthma, and chest pain. (Id.) The claim was denied on February 27, 2012. (Tr. 12.) Thereafter, plaintiff filed a written request for a hearing before an Administrative Law Judge on April 10, 2012. (Id.)

ALJ Ritter held a hearing on April 25, 2013 and issued an unfavorable decision on September 24, 2013. (Tr. 9, 11.) The Appeals Council denied the plaintiff's request for

review on November 24, 2014. (Tr. 1.) The decision of the ALJ therefore is the final decision of the Commissioner. 20 C.F.R. § 404.984(d).

## II. MEDICAL AND OTHER HISTORY

On October 6, 2011, plaintiff had a heart attack for which she was hospitalized at DePaul Health Center. (Tr. 336.) Cardiac catheterization showed a three-vessel coronary artery spasm in the right coronary artery and an ejection fraction of 25 percent. Plaintiff had stents inserted. (Tr. 354-55.) A later cardiac catheterization showed successful stenting of the left anterior descending artery. (Tr. 358.) She was discharged on October 12, 2011, and was advised to lose weight, follow a low fat/low sodium diet, regularly exercise, abstain from smoking, and to take all prescribed medications. (Tr. 338.)

On January 5, 2012, plaintiff followed up with her cardiologist Sundeep Das, M.D., who summarized a series of tests showing ejection fraction from July of 2009 to November of 2011. (Tr. 384.) These were as follows: July 13, 2009 (60 percent), January 7, 2011 (60 percent), October 7, 2011 (25 percent), October 27, 2011 (50 percent), and November 22, 2011 (55 percent). At this follow up she denied being in pain, however, she did have two episodes of intermittent chest pain since her October 2011 hospitalization. (Tr. 384-85.)

On January 30, 2012, plaintiff visited the DePaul emergency room complaining of chest pain and was admitted. (Tr. 401.) An endoscopy revealed that she had hiatal hernia. Plaintiff was started on a PPI (proton pump inhibitor) which resolved her chest pain and she was discharged. (Tr. 402.)

On March 13, 2012, plaintiff returned to the emergency room complaining of chest pain, describing it as a "sharp discomfort" with some symptom relief from her Nitroglycerin.[1] (Tr. 440.) She also said she was experiencing shortness of breath, but

---

[1] Nitroglycerin, an organic nitrate, is a vasodilator which has effects on both arteries and veins. The principal pharmacological action of nitroglycerin is a relaxation of vascular smooth muscle, producing a vasodilator effect on both peripheral arteries and veins with more prominent effects on the latter. Nitrolingual Pumpspray, Physician's Desk Reference 1246 (55th ed. 2001) (PDR).

2

denied arm pain, jaw pain, nausea, or vomiting. (Tr. 463.) Plaintiff was discharged on March 16, 2012. (Tr. 468.)

In a letter dated March 21, 2012, Dr. Das stated that plaintiff's main problem was intractable coronary artery spasm. In his opinion, due to her intractable symptoms and inability to predict the symptoms in a reliable fashion, she should be on long term disability. (Tr. 439.)

On April 12, 2012, plaintiff followed up with Dr. Das who noted that her weight increased from 210 to 221 pounds. (Tr. 491.) She complained of intermittent chest pains and asthma exacerbation. She had been undergoing ECP therapy but denied it had any effect on her chest pain. (Tr. 492.) Dr. Das recommended implanting a spinal cord stimulator and referred her to pain management. (Tr. 493.)

On August 14, 2012, plaintiff's visit noted intermittent resting palpitations, racing/skipping heartbeats, and chest pain. (Tr. 487-88.) The physical examination was normal. (Tr. 489.) Dr. Das recommended a new medication subject to whether her insurance would pay for it. (Id.)

On November 19, 2012, plaintiff returned complaining of a lot of fatigue. (Tr. 482-83.) Dr. Das ordered a repeat echo and a Holter to determine whether there was a recurrent ischemia. (Tr. 485.) Her medications remained unchanged. (Tr. 485-86.) On November 26, 2012, plaintiff underwent a transthoracic echocardiogram and Doppler examination which showed a left ventricular ejection fraction between 45-50 percent and "no significant valvular abnormalities." (Tr. 497-98.)

On March 2, 2013, plaintiff spent one night in the hospital after going to the emergency room reporting chest pain. (Tr. 469.) She was advised to follow a cardiac diet and released to return to work after one day. (Tr. 475.) On March 18, 2013, plaintiff followed up with Dr. Das and continued to report intermittent chest discomfort as well as palpitations, fatigue, dizziness/lightheadedness, and shortness of breath when climbing stairs and walking around her home. (Tr. 477.) She admitted that her recent trip to the emergency room showed normal troponins. Dr. Das noted that an echocardiogram showed "some decline" in the left ventricle. (Tr. 479.)

On April 23, 2013, plaintiff underwent an exercise stress test which showed "negligible" functional limitation which may be heart or perfusion related and a result of "deconditioning." (Tr. 510.)

> Pulmonary blood flow pattern during the exercise was abnormal suggesting impaired cardiac output (CO) response to exercise and abnormal pulmonary perfusion during exercise. Resting PCO2 was normal suggesting adequate resting pulmonary blood flow. Cardiopulmonary reserve and O2 transport to tissues with exercise was mild/moderately impaired. (Id.)

On April 30, 2013, Dr. Das added a new medication, Tracleer (also referred to as Bosentan). (Tr. 505, 508.) He noted possible improvement with Tracleer when plaintiff returned for her June 3, 2013 visit. (Tr. 500, 503.) Dr. Das discontinued plaintiff's use of aspirin and noted that she would undergo a repeat Holter study prior to her next visit in November 2013, at which time she would undergo a repeat echo. (Tr. 503, 504.) The echo was conducted on November 5, 2013, in which no "significant valvular abnormalities" were found. (Tr. 517.)

On December 26, 2013, plaintiff followed up complaining of worsening hypertension and sporadic intermittent chest pains which last about a minute and then resolve, usually one to two times a week. (Tr. 519.) Plaintiff had not been using her cpap. (Id.) She was instructed to do so. (Tr. 522.)

### III. ALJ HEARING

The ALJ held a hearing on April 25, 2013. (Tr. 30.) The plaintiff attended with her counsel present and testified to the following facts. She was at the time 45 years old and weighed 211 pounds. (Tr. 35.) She does not have any children living with her. Her husband is employed and lives with her. (Tr. 36.) She lives home alone during the day but her mother and sisters come over to spend time with her. (Tr. 36-37.) She drives her motor vehicle "at times," mostly twice a week. (Tr. 37.) Plaintiff puts in roughly an hour to an hour and a half in household chores. (Tr. 38.) She has two years of college experience in which her field of study was computer operations. (Tr. 39.) Plaintiff's past relevant work includes working in collections at a department store from 1996-1997, at a

4

bank in collections from 1997-1998, billing and collections at a hospital from 1999-2008, and collections for a billing and collection company from 2009-2011. These jobs entailed desk work, telephone work, and inputting information into a computer about bills. (Tr. 40.) She classified the work as sedentary and agreed that she did not have to lift more than 10 pounds. (Tr. 41.)

Plaintiff had a heart attack on October 6th. She was admitted to the hospital and held for three days, sent home, and returned a day later. (Tr. 41.) She had stents put in. She admitted to having a long history of heart problems. She was treated by Dr. Das who placed some restrictions on her including avoiding strenuous activity and stressful work. She stated that Dr. Das does not want her working at all. (Tr. 42-43.) She worries about her heart because she is unsure when it is a real problem and when it is not. For chest pain, she takes three types of nitroglycerin including the patch, the pill, and the emergency spray.[2] (Tr. 43.) She gets a sharp stabbing pain in her chest which sometimes feels like heartburn and sometimes feels like a tingling sensation. (Tr. 44.) The emergency spray works well for her in those situations. (T. 44-45.) Within the last year she had been to the hospital about three to four times and she was held overnight. (Tr. 45.) The most strenuous activity she recalls doing was washing clothes, although she states that she does not engage in many activities because she is scared as she never knows when she is going to have an attack. (Tr. 46.)

Plaintiff states that sometimes she feels chest pain walking up her basement steps but other times she could be resting and gets chest pain. (Tr. 47.) These episodes of chest pain occur roughly three to four times a week and last approximately five to seven minutes. (Tr. 50.) Plaintiff takes nitroglycerin, which usually gives her headaches or makes her nauseous. (Tr. 50.) If the nitroglycerin does not work by the second spray, plaintiff usually goes to the emergency room. (Tr. 51.) Plaintiff also has asthma for which she uses an albuterol inhaler. She has a nebulizer with albuterol and she also takes Advair and Spiriva on a daily basis. She still gets asthma attacks despite the medication

---

[2] The nitroglycerin spray is prescribed to patients for acute relief of an attack or prophylaxis of angina pectoris due to coronary artery disease. See footnote 1.

at times. (Tr. 47.) She also gets upper respiratory tract infections throughout the year. (Tr. 48.) Plaintiff claims that her asthma has gotten a little better since she stopped working. (Id.) She has never been a smoker and she does not come in contact with secondhand smoke. Plaintiff's primary conditions are her asthma, her heart, and hypertension. She has not been treated by a doctor for anxiety or depression. She believes she is depressed over her heart condition and probably needs treatment for that. (Tr. 49.)

At the evidentiary hearing before the ALJ, George C. Oliver, M.D., a consulting cardiologist Medical Expert, testified. (Tr. 53-80) (see below).

### III. DECISION OF THE ALJ

On September 24, 2013, the ALJ found plaintiff not disabled. (Tr. 12-23.) At the first step the ALJ found that plaintiff met the insured status requirements of Title II of the Social Security Act through December 31, 2016, and had not been engaged in substantial gainful activity since October 6, 2011, her alleged onset date. (Tr. 14.)

At the second step the ALJ found plaintiff did have severe impairments that have more than minimal effect on her ability to engage in work: prinzmetal angina status post insertion of six stents, hiatal hernia with complaints of heartburn (gastroesophageal reflux disease or "GERD"), hypertension, and obesity. (Tr. 14.)

At step three the ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). The ALJ found that medical evidence did not document listing-level severity and no acceptable medical source mentioned findings equal in severity to the criteria of any listed impairment. In addition, there are no specific listings for hypertension or obesity. (Tr. 15.)

The ALJ then considered the entire record and determined plaintiff had the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b) except no concentrated exposure to respiratory irritants such as fumes, odors, dusts, gases, and poor ventilation. (Id.) At step four, the ALJ found plaintiff

capable of performing past relevant work in billing and collections as this work did not require the performance of work-related activities precluded by the plaintiff's RFC. (Tr. 22.) Subsequently, the ALJ found that plaintiff was not under a disability as defined in the Social Security Act from October 6, 2011 through the date of this decision. (Tr. 22.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove that she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in a death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 CFR § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the

7

Commissioner's analysis proceeds to Step Four and Five.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW). Id. § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating she is no longer able to return to her PRW.  Pate-Fires, 564 F.3d at 942.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred by discrediting the opinion of the treating specialist while giving great weight to the opinion of the medical expert who testified at plaintiff's hearing, failed to consider the plaintiff's subjective complaints under the standards contained in Polaski, and failed to go through the Pfitzner analysis after finding plaintiff had significant non-exertional impairments, but did not conduct vocational expert testimony to that effect.

**A. Plaintiff's RFC**

Plaintiff argues that the ALJ failed to articulate a legally sufficient rationale for the weight accorded the various medical opinions in formulating the residual functional capacity.  Additionally, plaintiff argues that the ALJ erred in failing to give legally proper weight to her treating physician's opinion. (Pl.'s Br. 6, 8.)

RFC is a medical determination. Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000).  The RFC is what a plaintiff can do despite her limitations, which is to be "determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations." Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. § 404.1545(a)(1). Plaintiff's treating physician is given controlling weight if the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir.

2000); see also Turpin v. Colvin, 750 F.3d 989, 993 (8th Cir. 2014) ("The ALJ must evaluate the record as a whole and while treating physicians' opinions are 'entitled to special weight,' they are not automatically controlling.") (quoting Bentley v. Shalala, 52 F.3d 784, 785-86 (8th Cir. 1995)). The ALJ may give less weight to a conclusory or inconsistent opinion by a treating physician. Samons v. Astrue, 497 F.3d 813, 818-19 (8th Cir. 2007). Furthermore, pursuant to House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007), "[a] treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination."

The RFC conclusions were reached by a non-examining State Disability Determination Services physician, Kenneth Smith, M.D., who found plaintiff not disabled. Dr. Smith's opinion was given some weight particularly in a case like this where it is possible to reach similar conclusions based on a number of reasons. Dr. Smith found plaintiff was capable of sedentary work with occasional climbing of ramps and stairs, but never ladders, ropes, and scaffolds; occasional stooping, kneeling, crouching, and crawling; no concentrated exposure to extreme cold, extreme heat, and humidity; not even moderate exposure to hazards (including moving machinery and unprotected heights); and no exposure to pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation. Dr. Smith's opinion was based on plaintiff's history of coronary artery disease and asthma. On obesity, while there is no specific medical listing for obesity, the ALJ noted that plaintiff is obese with a body mass index (BMI) of 32 (height of five feet nine inches, weight of 220 pounds based on the stress test administered on April 23, 2013). (Tr. 20, 505, 510.) Social Security Ruling (SSR) 02-1p recognizes that obesity can cause limitation of function and obesity combined with other impairments may be greater than without obesity. Therefore, plaintiff's obesity was taken into consideration in the limitations assessed.

Dr. Oliver, the medical expert, testified at the hearing before the ALJ that there was no reason to limit plaintiff's physical activity because her chest pain was not triggered by the activity. (Tr. 21.) Dr. Oliver testified that based on the record and from

9

plaintiff's testimony, she could be sitting in a chair doing nothing or talking or reading a book and get chest discomfort. Therefore, in Dr. Oliver's opinion, activity is not a provoking factor in plaintiff's chest pain because she appears to get them at unpredictable times, and she is frightened by them. (Tr. 66.)

Dr. Das, however, indicated in a letter dated March 21, 2012, that because of plaintiff's intractable symptoms and inability to predict the symptoms in a reliable fashion, she should be on long-term disability as she is not going to be able to obtain any reasonable employment of any capacity. (Tr. 439.) The ALJ gave no weight to this opinion because the decision did not provide specific medical evidence on which the determination was based. (Tr. 21.) In addition, the determination of whether or not plaintiff is disabled under the Social Security Act rests exclusively with the Commissioner. (Id.) Dr. Das also believed that plaintiff's heart condition was a Class III on the New York Heart Association's Classification[3] scale in a form dated April 24, 2013, which would result in "marked limitation of physical activity." (Tr. 22.) The ALJ gave Dr. Das's opinion no weight, because Dr. Oliver testified that plaintiff's condition did not satisfy the requisites to be considered Class III because her symptoms seemed to occur regardless of whether she was walking or sitting or any other physical exertion. Furthermore, Dr. Oliver believed it was difficult to rate the plaintiff under the New York Heart Association Classification, because at that particular time she did not undergo a stress test. (Tr. 55.) The ALJ also found that Dr. Das's opinion lacked specificity and did not provide detailed objective findings to support his opinion for long-term disability. (Tr. 22.)

Dr. Oliver testified there are a number of factors to consider in order to determine the severity of the heart condition. (Tr. 56.) First, one looks to the stress test (conducted

---

[3] New York Heart Association (NYHA) Functional Classification is the most commonly used classification system. Class III: Patient symptoms include marked limitation of physical activity; comfortable at rest; less than ordinary activity causes fatigue, palpitation, or dyspnea (shortness of breath). Classes of Heart Failure, Heart.org, http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-Heart Failure_UCM_306328_Article.jsp#.ViEo6yu_u8k.

on April 23, 2013-post hearing date) (Tr. 510.) Plaintiff's stress test showed "negligible" functional limitation which may be heart or perfusion related. (Id.) Second, look at the ability of the heart muscle to pump blood which is measured by an ejection fraction. Plaintiff had multiple measurements of her ejection fraction and most were normal with the exception of one. However, during that measurement she was on a catheterization table which was intentionally causing spams in the arteries that feed the heart, thereby limiting the blood flow to the heart muscle. Under those circumstances, Dr. Oliver testified, it is not surprising that her heart muscle was not pumping blood as normal. (Tr. 56.) Third, look at the ability of the arteries to carry blood to the heart muscle at rest and at the end of exercise. (Tr. 57.) This can be done using a stress test or by heart catheterization. Plaintiff had several heart catheterizations and the results indicated that plaintiff's right coronary artery was in spasm and had a long area of spasm. Plaintiff had three stents placed in the right coronary artery. A stent is a cylinder made of mesh that is used to prop the artery open so it cannot narrow down. The procedure was successful and the blood flow was excellent. Plaintiff had an additional set of three stents placed in three other major arteries. This procedure was also successful. The arteries were open and carrying blood normally. (Tr. 58-59.) Dr. Oliver testified that, based on the chronology of plaintiff's chest pains, the surgical application of the stents into her arteries, the lack of cardiac ischemia, and plaintiff's history of GERD, he could not say what the cause of plaintiff's chest pain was. (Tr. 62.) Dr. Oliver did not have the cardiac catheterization report that was conducted in November 2012. The ALJ read the conclusion to him in order to obtain his opinion on the matter, however. (Tr. 74.) The normal left ventricular ejection fraction is around 50 percent or above. The Social Security disability figure is 30 percent or below. (Tr. 76.)

There is substantial evidence supporting the ALJ's RFC finding. This evidence includes: (a) plaintiff's visit to Dr. Das only every three to four months; (b) results of the April 23, 2013 exercise stress test; (c) successful treatment of her symptoms with stenting and medication; (d) repeated objective medical testing that showed her chest pain was not cardiac in nature; (e) plaintiff's failure to follow recommendations made by her treating

11

physicians; (f) plaintiff's ability to work prior to alleged onset date with the same intensity of her cardiac symptoms; (g) opinion of the State agency medical consultant; and (h) opinion of Dr. Oliver, the medical expert. (Tr. 22.) Dr. Das's opinion, while entitled to special consideration, was not automatically controlling in light of other substantial evidence in the record.

### B. Plaintiff's subjective complaints

Plaintiff argues that the ALJ erred in failing to consider her subjective complaints of unpredictable chest pains, complaints of anxiety and depression, and side effects of her medication resulting in headaches and nausea under the standards contained in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). (Pl.'s Br. 11-12.)

In evaluating a plaintiff's subjective symptoms using the Polaski factors, the ALJ must make a credibility determination. See Ellis v. Barnhart, 392 F.3d 988, 995-96 (8th Cir. 2005). These factors include: (1) the plaintiff's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. Polaski, 739 F.2d at 1322. The ALJ does not need to discuss each factor separately, rather the court will review the record as a whole to ensure such evidence was not disregarded by the ALJ. See McCoy v. Astrue, 648 F.3d 605, 615 (8th Cir. 2011). Subjective complaints may be discounted if there are inconsistencies in the record as a whole. Polaski, 739 F.2d at 1322. The ALJ must make an express credibility determination when rejecting plaintiff's complaints of pain by giving reasons for discrediting the testimony, stating the inconsistencies, and discussing the Polaski factors. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

Substantial evidence supports the ALJ's finding that plaintiff's chest pains were not so severe in intensity or persistence that she could not perform light work. The plaintiff's treatment records between January 2011 and December 2013 reveal that she described her chest pain as only moderate (4/10) in severity, she experienced chest pain

12

only a "few" or one or two times weekly, her chest pain generally resolved within minutes by the intake of the nitroglycerin spray, and furthermore her pain was not triggered by activity or exertion. (Tr. 18, 20, 241, 245, 249, 253, 313, 455, 463-64, 477, 482, 501, 519, 524, 530.) Plaintiff also testified at her hearing that her chest pain would usually resolve by taking the nitroglycerin spray which "pretty much works" right away or within a minute. (Tr. 43-45.) As far as plaintiff's argument concerning side effects of the medication are concerned, the record shows that plaintiff did not experience such side effects in a manner which would render her disabled. Dr. Oliver's testimony revealed that headaches and nausea were possible side effects of nitroglycerin. (Tr. 18, 73.) However, aside from plaintiff's report of experiencing nausea with chest pain in her emergency visit in October 2011, she did not report to nurses or doctors that she was experiencing nausea or headaches as side effects to her medication. Plaintiff denied experiencing headaches during doctor visits in January 2011, February 2011, March 2011, March 2012, and November 2013. (Tr. 245, 250, 413, 464-65, 531.) In addition, she denied experiencing nausea on doctor visits in January 2011, February 2011, June 2011, March 2012, April 2013, June 2013, and November 2013. (Tr. 242, 250, 254, 327, 463-65, 478, 502, 531.)

Plaintiff testified at the ALJ hearing that she is depressed, however, she also admitted that she had never been treated for depression or anxiety. (Tr. 49.) Plaintiff did not indicate that she suffered from a mental impairment when she applied for disability, listing only spasms in arteries, heart attacks, asthma, and chest pains. (Tr. 204.) In addition, plaintiff consistently denied to her health care providers that she was experiencing unusual stress, difficulty concentrating, anxiety, or depression. (Tr. 242, 246, 250, 254, 502.)

The ALJ lawfully discounted plaintiff's subjective complaints because there were several inconsistencies in the record which showed her chest pain was not as severe, the pain usually resolved by the intake of her medication, and she did not report side effects of the medication. In reaching this conclusion, the ALJ applied the Polaski factors to

13

plaintiff's condition and detailed the reasons for discrediting her testimony regarding her subjective complaints.

### C. Vocational expert testimony

Plaintiff argues that once significant non-exertional impairments are shown to exist, vocational expert testimony is required, and in its absence the ALJ's decision is not supported by substantial evidence. Plaintiff argues that the ALJ made no explicit findings with respect to the mental demands of plaintiff's past work and only cited the Dictionary of Occupational Titles to show the physical demands of her past relevant work. See Pfitzner v. Apfel, 169 F.3d 566, 568-569 (8th Cir. 1999). Therefore, plaintiff argues, the ALJ failed to go through the function by function analysis under Pfitzner. (Pl.'s Br. 13).

The ALJ is required to make specific findings as to plaintiff's RFC and past work demands. Pfitzner, 169 F.3d at 569. Determining plaintiff's RFC is not the only task required at step four of the analysis, rather the "ALJ must also make explicit findings regarding the actual physical and mental demands of the claimant's past work." Id. (quoting Groeper v. Sullivan, 932 F.2d 1234, 1239 (8th Cir. 1991)). The ALJ may do so by referring to the specific job descriptions in the Dictionary of Occupational Titles associated with plaintiff's past work. See Sells v. Shalala, 48 F.3d 1044, 1047 (8th Cir. 1995).

In Pfitzner, 169 F.3d at 567, plaintiff had been diagnosed by a psychiatrist as suffering from major depression with anxiety. Plaintiff in the present case testified that she had never been treated for depression or anxiety. (Tr. 49.) Plaintiff did not indicate that she suffered from a mental impairment when she applied for disability, listing only spasms in arteries, heart attacks, asthma, and chest pains. (Tr. 204.) In addition, plaintiff consistently denied to her health care providers that she was experiencing unusual stress, difficulty concentrating, anxiety, or depression. (Tr. 242, 246, 250, 254, 502.) Therefore, the ALJ lawfully concluded that plaintiff did not have a severe mental impairment that would render her unable to return to her past work and as such the ALJ

was not required to consider the mental demands of plaintiff's past work. Despite the fact that plaintiff received various forms of treatment for disabling symptoms, the treatment was generally successful in controlling these symptoms when administered. Plaintiff visited her treating physician Dr. Das every three or four months. While plaintiff had a number of hospital admissions in the medical record, cardiac problems were ruled out in almost every visit following the stent insertion in October of 2011. (Tr. 20.) Dr. Oliver confirmed that the results of the stenting were "wonderful." (Tr. 59.) In addition, the record showed that plaintiff failed to follow-up on recommendations made by the treating doctor, suggesting that the symptoms perhaps were not as serious. For example, plaintiff was advised multiple times to lose weight, follow a cardiac diet, and maintain regular physical activity. The record showed that her weight remained constant and her activity level was also very low. (Tr. 20.) Thus, plaintiff's subjective complaints of pain were discounted in light of the evidence as a whole.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgement Order is issued herewith.

S/ David D. Noce<br>
**UNITED STATES MAGISTRATE JUDGE**

Signed on February 11, 2016.